IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CENTER FOR BIOLOGICAL DIVERSITY,)
OREGON NATURAL RESOURCES )
COUNCIL, PACIFIC RIVERS COUNCIL, )
and WATERWATCH, )
  )
           Plaintiffs, )    Case No. 05-165-KI
  )
     vs. )    OPINION AND ORDER
  )
UNITED STATES FISH AND WILD- )
LIFE SERVICE, )
  )
          Defendant. )
  )
    and )
  )
BUILDING INDUSTRY ASSOCIATION )
OF WASHINGTON, WASHINGTON )
FARMS BUREAU, WASHINGTON )
CONTRACT LOGGERS ASSOCIATION, )
INC., WASHINGTON STATE DAIRY )
FEDERATION, and WASHINGTON )
CATTLEMEN'S ASSOCIATION, )
  )
     Defendant-Intervenors. )

Michael Mayer
Patti Goldman
Earthjustice
705 Second Avenue, Suite 203
Seattle, Washington  98104

Stephanie Parent
Pacific Environmental Advocacy Center
10015 S. W. Terrilliger Boulevard
Portland, Oregon  97219

      Attorneys for Plaintiff

Kelly A. Johnson
Acting Assistant Attorney General
Jean Williams
Lisa L. Russell
Meredith L. Flax
U. S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D. C.  20044-7369

      Attorneys for Defendant

Ross Day
Oregonians in Action
P. O. Box 230637
Tigard, Oregon  97281

Russell C. Brooks
Pacific Legal Foundation
10940 N. E. 33rd Place, Suite 109
Bellevue, Washington  98004

      Attorneys for Defendant-Intervenors

///

///

KING, Judge:

Plaintiffs challenge defendant United States Fish and Wildlife Service's ("FWS") decision under the Endangered Species Act ("ESA") that a listing of the Southwestern Washington/Columbia River Distinct Population Segment of coastal cutthroat trout is not warranted. Before the court are cross motions for summary judgment filed by plaintiffs, FWS, and defendant-intervenors.[1] For the reasons below, I grant summary judgment in favor of FWS and the defendant-intervenors and dismiss plaintiffs' claims.

## FACTS

The coastal cutthroat trout, a subspecies of cutthroat trout, has a life history in three basic forms: resident, anadromous, and freshwater migratory. Resident coastal cutthroat trout stay in the same stream or river for the entire life cycle. Freshwater migratory coastal cutthroat trout move within fresh water when spawning. Saltwater migratory, also called anadromous, coastal cutthroat trout travel more extensively throughout a river system and spend time in the ocean before returning to the original freshwater stream.

The number of coastal cutthroat trout exhibiting the anadromous form in the lower Columbia River and its tributaries has been in decline.

On December 5, 1997, plaintiff Oregon Natural Resources Council and others petitioned the National Marine Fisheries Service ("NMFS") to list "sea-run cutthroat trout" as threatened or endangered "throughout its range in California, Oregon and Washington." NMFS convened biologists from several federal agencies to form a biological review team ("BRT") to evaluate the

---

[1] The defendant-intervenors are several Washington trade organizations who collectively refer to themselves as the Landowners. I have studied their briefing but will only call them out separately in this opinion if they raise an issue that is not raised by FWS.

subspecies' status. The BRT divided the Washington, Oregon and California population of coastal cutthroat trout into six evolutionarily significant units ("ESUs") which equate to distinct population segments[2] ("DPSs") under the ESA. Each ESU included all life history forms present within it.

The BRT evaluated the risk of extinction for the five ESUs that included the anadromous form. The BRT concluded that the Southwestern Washington/Columbia River ("SWW/CR") ESU was likely to become endangered in the foreseeable future and thus would qualify as a threatened species. On April 5, 1999, NMFS and FWS proposed to list "naturally spawning populations" of coastal cutthroat trout in the SWW/CR ESU as threatened under the ESA. The Washington Department of Fish and Wildlife ("WDFW") and the Oregon Department of Fish and Wildlife ("ODFW") opposed the proposed listing.

FWS and NMFS agreed that FWS should assume sole jurisdiction over the matter because the coastal cutthroat trout was primarily a freshwater subspecies. FWS assembled a different team of biologists which included Dr. Donald Campton, FWS's Regional Fish Geneticist, who previously served on the BRT and extensively researched the genetics of coastal cutthroat trout.

On July 5, 2002, FWS published its final determination to withdraw the proposed rule and to find that a listing under the Endangered Species Act was not warranted. It gave these reasons for determining that the subspecies did not meet the listing criteria:

---

[2] The parties consider DPSs and ESUs to be essentially interchangeable terms. NMFS tends to use the term ESU and FWS tends to use the term DPS. No one has argued that there is any difference between the two terms for purposes of the issues before the court.

(1) New data indicating that coastal cutthroat trout are more abundant in southwest Washington than previously thought and that population sizes are comparable to those of healthy populations in other areas; (2) new information and analyses calling into question past interpretation of the size of the anadromous portion of the population in the Columbia River and indicating higher numbers than previously described; (3) new data and analyses no longer showing declining adult populations in the Grays Harbor tributaries; (4) new analyses that call into question the past interpretation of trend data, and therefore the magnitude of the trend in the anadromous portion of the population in the Columbia River; (5) new information about the production of anadromous progeny by above-barrier cutthroat trout; and (6) two large-scale Habitat Conservation Plans (HCPs) and significant changes in Washington Forest Practices Regulations substantially reducing threats to aquatic and riparian habitat on forest lands in Washington.

AR 26.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.      ESA Statutory Framework

The purpose of the ESA is to

provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species.

16 U.S.C. § 1531(b).

Under the ESA, a "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. at § 1532(16). Endangered species means "any species which is in danger of extinction throughout all or a significant portion of its range." Id. at § 1532(6). Threatened species means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20).

> The Secretary shall . . . determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

Id. at § 1533(a)(1).

> The Secretary shall make determinations . . . solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

Id. at § 1533 (b)(1)(A).

The court reviews ESA listing decisions under the Administrative Procedure Act ("APA"). "The relevant inquiry is whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." Center for

Biological Diversity v. Badgley, 335 F.3d 1097, 1100 (9th Cir. 2003) (internal quotation omitted).

Under the APA, the court may overturn an agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 109 S. Ct. 1851 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999). In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh, 490 U.S. at 378. "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm., 92 F.3d 940, 942 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983)). The agency must articulate a rational connection between the facts found and the conclusions made. Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997). Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. O'Keeffe's, 92 F.3d at 942. The court also must give deference to the agency when there is a difference of opinion on the impact of the proposed action, including when there are disagreements between different federal agencies. Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1449 (9th Cir. 1996).

FWS notes that plaintiffs incorrectly interpret the ESA when they argue that a species must be listed if the Secretary finds that any one or more of the five statutory factors are present. FWS argues that neither the statute nor the regulations require listing if only one factor is present, regardless of whether the threats rise to the level to trigger threatened or endangered status. FWS also notes that the statute does not assign relative importance to any of the five factors but instead leaves it to the Secretary's informed discretion.

The parties do not appear actually to be in dispute. The ESA requires listing if a species is threatened or endangered because of one or a combination of the factors. In their reply, plaintiffs clarified that they were not arguing that listing was required if one or more factors were present but only causing a de minimis decline in population.

## II. Motion to Strike

Defendant moves to strike a <u>Federal Register</u> notice ("Notice"), 70 Fed. Reg. 37219-37220 (June 28, 2005), and Exhibits 1-5 attached to Corrected Plaintiffs' Opposition to Cross Motion for Summary Judgment and Reply to Support of Motion for Summary Judgment.

Judicial review of an agency decision usually focuses on the administrative record in existence at the time of the decision. The agency must justify its action by reference to the reasons it considered at the time it acted. <u>Friends of the Clearwater v. Dombeck</u>, 222 F.3d 552, 560 (9th Cir. 2000). Extra-record materials may be relied upon by the court under a few exceptions: (1) if necessary to determine if the agency considered all relevant factors and explained its decision; (2) if the agency relied on documents not in the record; (3) to explain technical or complex subject matter; or (4) if plaintiff makes a showing of agency bad faith. Post-decision information cannot be advanced as a new rationalization to either sustain or attack an agency's decision. <u>Southwest Center</u>, 100 F.3d at 1450.

The Notice and Exhibits 1-3 all post-date by two to three years the decision being reviewed. Plaintiffs argue that post-decisional documents may be examined by the court to demonstrate factors that FWS should have considered but did not. Plaintiffs also contend that these documents help explain the technical and complex subject matter before the court.

I have examined the documents and do not consider them to be in the nature of a tutorial to help explain complex subject matter. The exhibits are the reports of three panels examining questions put to them by NOAA Fisheries concerning ESUs and the conservation difficulties presented by the multiple life histories of some species of fish, as well as the mixing of wild and hatchery fish. Clearly, the science is evolving, causing NOAA Fisheries to present the questions to the panels of scientists for study. Because of that, I do not think the law supports using documents created several years after a decision to determine if the earlier decision was arbitrary and capricious. Consequently, I strike the Notice and Exhibits 1-3.

Exhibit 4 contains an excerpt of the December 21, 2000 Biological Opinion, Reinitiation of Consultation on Operation of the Federal Columbia River Power System, including the Juvenile Fish Transportation Program and 19 Bureau of Reclamation Projects in the Columbia Basin ("BiOp"). A different excerpt is in the administrative record at AR Doc. 72 at 2363. FWS had the BiOp before it when making the decision at issue. I will allow plaintiffs to supplement the record with the portion of the document which they contend support their arguments. "The whole administrative record . . . is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record. The 'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." Thompson v. United States Dept. of Labor, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original, internal quotation and citation omitted).

Exhibit 5 is an excerpt from the Final Basinwide Salmon Recovery Strategy ("BSRS"), a document that was cited in the BiOp, although not in the pages excerpted by any of the parties here. See National Wildlife Federation v. National Marine Fisheries Service, 254 F. Supp. 2d 1196, 1201 (D. Or. 2003) (noting that the BiOp was developed in coordination with other federal and regional processes, including the BSRS). Thus, Exhibit 5 was indirectly considered by FWS. I deny the motion to strike.

I also strike from plaintiffs' brief any argument relying on the stricken documents but I will not require plaintiffs to refile their brief.

III.    Plaintiffs' Arguments

    A.    Threats to Anadromous Population

        1.    Population Trends

Plaintiffs note the proposed rule's findings that the anadromous form of the species had downward population trends in the southwest Washington and Columbia River populations. Plaintiffs then point to the final rule's assessment that the declines of the anadromous form in the Columbia River are less pronounced than previously believed. Likewise, the final rule finds that there is no current downward trend in the anadromous form in southwest Washington. Plaintiffs also object to FWS's reliance on the fishing diary of a single individual to support the southwest Washington conclusion. They note this reliance is in contrast to the usual FWS policy not to accept most anecdotal evidence. Combined with the BRT's conclusion that the loss of anadromous life history constituted a significant risk to the entire coastal cutthroat trout population, plaintiffs argue that FWS fundamentally failed to consider properly the declines in the anadromous form in light of current threats.

FWS notes that population data for the coastal cutthroat trout is not readily obtainable because it is not a commercial species. FWS argues that it used the best scientific and commercial data available to develop reliable estimates of the coastal cutthroat trout abundance and to draw conclusions about its population trends. FWS notes that in making the final rule, it had new population trend information. Based on the new data, FWS no longer endorsed the BRT conclusion. FWS contends that plaintiffs ignore or belittle the new data received after the proposed rule and the new analysis showing the low reliability of trends for some of the data on which the BRT relied. FWS notes that after its team evaluated the data reviewed by the BRT, along with the new data submitted after the proposed listing, the entire FWS team agreed that the SWW/CR DPS of coastal cutthroat trout was not likely to become endangered in the foreseeable future. The record contains the written rationales explaining how each of the FWS team members came to that conclusion.

Both the BRT, in drafting the Status Review which was the basis for the proposed rule, and FWS, in withdrawing the proposed rule, had to face the fact that there was little quantitative information about coastal cutthroat trout due to the fact that it is not a commercially caught species. 64 Fed. Reg. 16397, 16399 (April 5, 1999); AR 1933. This made the task difficult and set the stage for FWS to have additional data to evaluate as more studies became available. The BRT acknowledged that it received some information too late for discussion. AR 2138. Moreover, "[g]enetic and environmental influences on these migratory pathways and life-history attributes are poorly understood." AR 1946. "Team [BRT] members concurred that loss of any individual life-history form could increase risk to the ESU as a whole." Id. As discussed below, an increased risk does not necessarily mean that the species should be listed under the ESA criteria.

An examination of the BRT Status Review makes it look like coastal cutthroat trout in the SWW/CR ESU are in dire straights. "Severe habitat degradation throughout the Lower Columbia River area has contributed to dramatic declines in anadromous coastal cutthroat trout populations and two near extinctions of anadromous runs in the Hood and Sandy rivers."

AR 1954.

> A significant risk factor for coastal cutthroat trout in this ESU is reduction in life-history diversity. . . . Habitat degradation in stream reaches accessible to anadromous coastal cutthroat trout and poor ocean and estuarine conditions probably have combined to severely deplete this life-history form throughout the Lower Columbia River Basin. Without the appropriate freshwater and estuarine habitat for expression of the anadromous life history, a greater risk of extinction may occur.

AR 1955.

The ability of the fish to change from one life history to another was not well understood:

> In addition, there is some information suggesting that freshwater forms of coastal cutthroat trout in some streams can product outmigrating juveniles that have a silvery "smolt-like" appearance. The ability of these fish to successfully migrate to salt water and return to spawn is not well quantified. In some cases, it is suspected that current habitat conditions in the lower reaches of streams or in nearshore marine environments are not of sufficient quality to allow survival of these outmigrants (e.g., in the Willamette River, OWFW 1998). In this case, freshwater life-history types would not be able to replenish anadromous forms under current habitat conditions. On the other hand, ODFW (1998) and WDFW (1998c) believe that smolts from freshwater forms of coastal cutthroat trout are contributing to adult returns in several Oregon coastal streams and in some streams in the Lower Columbia River Basin. Currently, there is not enough information to evaluate the likelihood that these alternative scenarios occur through the range of coastal cutthroat trout. Presumably, the ability of freshwater forms of coastal cutthroat trout to contribute to anadromous forms varies with river basin characteristics and the genetic composition of the populations within each basin.

AR 2106 (internal citation omitted).

Between the BRT status review in January 1999, and FWS's withdrawal of the proposed rule in July 2002, FWS was able to gather and analyze additional information. Additional

population data was received from WDFW and from fishing traps. A total of 156 sites were sampled during June through October of 2000 and 2001 in southwestern Washington to determine distribution and relative abundance of coastal cutthroat trout there. AR 2334-35. FWS was able to do further analysis on the reliability of the data and varied the weight given to a data set based on the set's reliability. AR 4, 6. Additional studies became available concerning the ability of the freshwater population to produce anadromous migrants. AR 9 (Johnson 1999, WDFW 2001, WDFW 2001c). FWS noted the inherent bias of hook and line data from a single individual and did not solely rely on it. AR 7.

FWS met with staff from NMFS to address NMFS' concern about FWS' proposed withdrawal recommendation. FWS also drafted a ten-page memorandum to provide written responses to NMFS' concerns. AR 7231-40.

Throughout the withdrawal notice, FWS quoted specific parts of the proposed rule, stated its changed conclusion, and gave the reasons for the change. See, e.g., AR 8 (summary of trend analysis).

Don Campton served both on the BRT and on the FWS team. He was asked to explain what caused him to change his mind between the two reviews. Compton stated:

> However, the USFWS's reanalysis of the status of CCT in the lower Columbia River did yield some new results (admittedly sparse) consistent with WDFW's arguments against the proposed listing. This new information – coupled with continued scientific uncertainties regarding the biological relationship between nonmigratory forms, smolts, and anadromous adults – was sufficient for me to question, in my own mind, whether the subspecies as a whole (both resident and anadromous forms) in the LCR was "likely to become endangered in the foreseeable future." In other words, the new information created a significant "shadow of a doubt" in my own mind regarding the proposed listing.
>
> . . . .

All the above factors, including (a) the aforementioned scientific uncertainties regarding the biological relationship between anadromous and nonmigratory forms within the same stream, (b) the mutual conclusions by NMFS and USFWS that nonmigratory forms are "widely distributed and relatively abundant", (c) the turnaround in marine tropic conditions, and (d) the new information, led me to question whether coastal cutthroat trout in the lower Columbia River are likely to become endangered in the foreseeable future.  In my opinion, a threatened listing at this time would be based too heavily on "speculation" and "untested assumptions", and not sufficiently on "sound science".  In short, a threatened listing may be difficult to defend scientifically at this time, particularly in light of the new information.  This latter conclusion does not mean that CCT in the LCR are "not in trouble"; it only means that a "threatened" listing may be difficult to defend based on the "best available scientific and commercial data".  Additional data obtained over the next five years may reduce these scientific uncertainties.  The apparent turnaround in marine tropic conditions will hopefully provide this latter opportunity.  A reassessment of status in five years would, thus, seem appropriate.

AR 7212.  The other FWS team members generally agreed.  AR 7316, 7339, 7213, 7341.  As

Rollie White explained:

The habitat section of a 5-factor analysis for any native fish inhabiting southwest Washington and the lower Columbia River today would be virtually identical to that Kathy assembled for CCT.  For species with very tight dependence on the types of habitat features Kathy described, this may lead them to meeting the definition of Threatened or Endangered.  For CCT, it does not.  In fact, for CCT, it does not even when you add up all the other factors as we've described them.

AR 7213.

FWS based its withdrawal on six specific things, listed above, which include new

information, two large-scale Habitat Conservation Plans, and then-recent changes in the

Washington Forest Practices Regulations.  FWS noted:

The anadromous portion of the DPS is likely depressed from historic levels, though it also appears to remain extant in all accessible portions of the DPS's range.  There is little specific information indicating the actual size of the anadromous portion of the population or that those populations are extremely low.

. . . .

> While past losses of estuaries may have contributed to a reduction in the anadromous portion of the coastal cutthroat trout population over historic levels, we do not have evidence that the past and potential future losses are likely to result in the DPS of coastal cutthroat trout becoming endangered in the foreseeable future.

AR 26, 28.

FWS did not lightly reverse course concerning the decline of the anadromous life form. During the years separating the two decisions, additional data became available which made the entire FWS team decide that the best scientific evidence did not support listing at this time. FWS considered the relevant factors and articulated a rational connection between the facts found and the choice made when examining the population trends and the anadromous life forms.

### 2. Treatment of Different Life Histories

Plaintiffs object to what they characterize as FWS's collapse of any distinction between the anadromous and resident populations so that FWS could rely on the relative stability of the residents to downplay the threats to the anadromous form and what those threats mean to the coastal cutthroat trout overall. Plaintiffs contend that science does not support treating resident and anadromous coastal cutthroat trout interchangeably. Plaintiffs argue that FWS's analysis is a particular problem because of the threats to the anadromous form's habitat from dams, agriculture, and the expansion of urban areas.

FWS argues that listing distinctions below a subspecies or a DPS of a species are not allowed under the ESA. FWS contends that the anadromous life-history strategy cannot be defined as a separate ESU because it is not substantially reproductively isolated from the resident and freshwater migratory life-history strategies of coastal cutthroat trout.

Plaintiffs clarified that they do not contend that FWS was required to consider whether the anadromous life-history is a separate ESU that itself warrants protection. Instead, plaintiffs

contend that FWS must consider the declines within and threats to the anadromous life history to make a defensible decision whether the ESU as a whole merits listing.

FWS contends that it discussed concerns specific to the anadromous portion of the DPS with respect to the five listing factors when it was appropriate.

Turning to the withdrawal notice, FWS stated that it no longer concluded that trends of the adult anadromous portion of the population and outmigrating juveniles in the southwest Washington portion of the DPS are all declining markedly. Similarly, it no longer concluded that returns of anadromous coastal cutthroat trout in almost all lower Columbia River streams have declined markedly over the last 10 to 15 years. AR 8. For the reasons stated above, I find that these conclusions, based on analysis of new data, were neither arbitrary nor capricious.

I also agree that FWS discussed the anadromous life history when it was appropriate to do so. The withdrawal notice contains discussions specific to the anadromous form in the summary of ESA factors affecting the species: (1) on the effect of dams and barriers; (2) on the effect of urban and industrial development; (3) on the effect of estuary degradation; and (4) on the ability of non-anadromous parents to produce anadromous progeny. AR 15-17.

I conclude that FWS took the required hard look when considering how threats to the anadromous life history affect the decision on whether to list the ESU as a whole.

B.     Habitat

Listing factor A in the ESA considers the present or threatened destruction, modification, or curtailment of the species' habitat or range.

FWS argues that its assessment of listing factor A was correctly done at the DPS level rather than at the level of a single life-history strategy. FWS contends that its conclusions are based on the best scientific data available and are particularly within the agency's expertise of

administering the ESA: (1) that past habitat degradation has not led to extremely low population levels, continuing long-term declines in the population, or significant curtailment of the range in the SWW/CR DPS; and (2) that current regulations reduce the risk that significant additional habitat modification will occur in the foreseeable future.

As I noted in the last section, the withdrawal notice expressly discussed the challenges faced by the anadromous life history with respect to dams and barriers, urban and industrial development, and estuary degradation. The amount of historical estuary habitat that has been lost in various areas is quantified. AR 16. Where plaintiffs part ways with FWS is in plaintiffs' conclusion that degraded habitat must have a serious deleterious effect on the anadromous life history which consequently causes endangered or threatened status for the coastal cutthroat trout in the ESU as a whole.

FWS scientists were surprised when they looked at the broader set of data beyond the habitat degradation. They decided that the subspecies is more resilient than previously believed. As noted by one of the FWS scientists, Rollie White:

> This is really the fish that has forced me to rethink a lot of my basic assumptions built up through many years as a fish biologist. Someone forgot to tell coastal cutthroat trout (CCT) the rules they are supposed to follow! Obviously, our conventional wisdom is simply not robust enough to account for what CCT can do.
>
> . . . I am struck by how the widespread watershed impacts of what would, for most fishes (certainly most salmonid fishes), be vital habitat characters, do not show the level of effect to the CCT populations across the DPS we'd expect. What would we expect? After 100+ years of these kinds of impacts we'd expect at least some pockets where CCT have become extirpated ("winked out" locally), reduced populations in areas that suffered the worst watershed impacts, maybe a strong correlation between the degree of these types of impacts and low population numbers or missing populations (where we'd otherwise expect them). Guess what? We see none of these. If simplified channels, altered flows, reduced habitat complexity, dams and other passage barriers are so bad for fish, as we traditionally assume they are, why are CCT so widespread after so many years of

these habitat impacts?  Kathy did a great job summarizing watershed conditions as the best available data describe them, but does that also mean she described CCT habitat condition?  No, clearly, CCT habitat needs are not the same as watershed condition.

. . . .

The habitat section of a 5-factor analysis for any native fish inhabiting southwest Washington and the lower Columbia River today would be virtually identical to that Kathy assembled for CCT.  For species with very tight dependence on the types of habitat features Kathy described, this may lead them to meeting the definition of Threatened or Endangered.  For CCT, it does not.  In fact, for CCT, it does not even when you add up all the other factors as we've described them.

AR 7213.  Another FWS scientists, Doug Young, stated:

Habitat:  essentially very poor shape.  No part of DPS would "buffer" other portions.  Based on very negative status of this single threat factor, and knowing the listing regulations, I would have been willing to support listing on this factor alone.  However, as noted above, poor habitat alone did not convince me, when all other species distribution, life history abundances, and behavioral "plasticity" are taken into account, that this one threat factor warranted a positive recommen[d]ation.

AR 7343.

The record does not support an argument that FWS ignored the decline in habitat.  When the population trends did not match what FWS expected from degraded habitat, FWS looked further.  This is the hard look that the agency must take.

C.      Existing Regulatory Mechanisms

Listing factor D considers the inadequacy of existing regulatory mechanisms.

Plaintiffs note that the anadromous coastal cutthroat trout habitat is degraded.  Plaintiffs argue that protecting estuaries and lower river reaches from the effects of agriculture, urbanization, and wetland fill is essential for the survival of anadromous coastal cutthroat trout, as is the removal of blockages to upstream spawning areas.  Plaintiffs contend that FWS's analysis demonstrates that existing regulatory mechanisms and forest practices have serious

deficiencies but the final rule ignores the question of whether there is sufficient regulatory oversight to manage and mitigate the effects.

Plaintiffs note that FWS highlighted forest practices, particularly protections in the Northwest Forest Plan and changes to Washington's Forest Practices Act, rather than concentrating on the segments of the watershed most relied upon by anadromous coastal cutthroat trout. Plaintiffs contend that FWS cannot rely on those regulatory mechanisms for three reasons: (1) the measures do not adequately address the principal threats to the anadromous life history; (2) the measures encompass only a portion of the anadromous coastal cutthroat trout habitat; and (3) the revised forestry practices in Washington are speculative.

FWS contends that the ESA does not require FWS to show what would be needed to make existing regulatory mechanisms adequate. Instead, FWS is required to assess whether the existing regulatory mechanisms are so inadequate that they represent a threat to the DPS and, either alone or in concert with the other listing factors, lead FWS to a conclusion that the species is threatened or endangered. FWS argues that plaintiffs' position is based on this misperception. FWS contends that while it acknowledged that the existing regulatory mechanisms would not fully protect or remove all risks to coastal cutthroat trout, the mechanisms were not so inadequate as to lead FWS to conclude that the coastal cutthroat trout in the SSW/CR DPS was threatened or endangered.

I generally agree with FWS's characterization of plaintiffs' argument. The ESA does not guarantee the best of all possible worlds for the species at issue. Instead, the agency is charged with determining whether one or more of the factors caused the species to be endangered or threatened. There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species.

FWS was aware of numerous problems with regulatory mechanisms, as documented in the 2002 Summary of Existing Regulatory Mechanisms. AR 4249. With one exception, the adequacy of the current standards and implementations for the listed state programs was low or low to moderate. Most of the mechanisms had foreseeable improvements noted, with the outcomes of the majority stated as uncertain. The summary states, "State-regulated land-use and growth management planning in the DPS have not provided for salmonid habitat and riparian/aquatic processes in a reliable, comprehensive, or consistent fashion." AR 4250. Washington forestry management practices fared better but Oregon practices lagged behind.

> OR: State-regulated timber harvest activities on nonfederal land have not provided for salmonid habitat and riparian/aquatic processes in a reliable, comprehensive, or consistent fashion. Not able to conclude that salmonid habitat and riparian/aquatic processes will not be threatened by ongoing and future activities within the DPS.

> WA: Improved conservation as result of new programs, but time necessary to determine full extent of benefits.

AR 4251.

FWS devotes five pages of the withdrawal notice to its analysis of the inadequacy of existing regulatory mechanisms. AR 19-24. There are long discussions of federal, Washington, and Oregon land management practices; dredge, fill, and inwater construction programs; water quality programs; and hatchery management. About 27 percent of the land in the DPS is federal land controlled primarily through the Northwest Forest Plan and the Aquatic Conservation Strategy. According to FWS, both mechanisms provide adequate management for the conservation of the coastal cutthroat trout, although primarily for freshwater life forms since the lands are generally located in the upper watersheds.

Plaintiffs primarily attack the adequacy of the state regulatory mechanisms. FWS did not gloss over the problems. It noted: (1) recent reviews of the Washington Growth Management Act indicated problems with its implementation; (2) uncertainty about the effects of Washington's Forest Practices Act ("WFPA"), as revised in 2001 to address conservation of salmonids; (3) the legacy of degraded riparian ecosystems caused by past forest management practices in Washington; (4) implementation problems with Oregon's land-use planning laws; and (5) concern about the ability of the Oregon Forest Practices Act ("OFPA") management activities to adequately support specific listed conditions crucial to salmonid habitat.

In the withdrawal notice, FWS noted the establishment of a comprehensive, long-term research, monitoring, and adaptive management program to determine the validity of the concerns. Eight percent of the DPS was under the management of habitat conservation plans ("HCP").

FWS concluded that the HCPs and changes to the WFPA should greatly reduce the risk of continued degradation of aquatic and riparian systems on forest lands in 30 percent of the DPS. AR 21. Although FWS had serious concerns about the OFPA, it concluded that since the Act impacts only 8 percent of the DPS, the Act's flaws were not likely to result in the coastal cutthroat trout becoming endangered in the foreseeable future. AR 22. The proposed rule considered neither the inadequacy of water quality regulatory mechanisms nor the dredge, fill, and inwater construction programs to be threats to the DPS. The withdrawal notice agreed that neither were significant threats. The release of hatchery-origin coastal cutthroat trout had been greatly decreased due to concern about genetic introgression and disease transmission. This reduction, combined with the lack of evidence that earlier concerns were causing a significant

reduction of the production and survival of native coastal cutthroat trout, caused FWS to conclude that hatchery releases do not represent a significant risk.

A significant portion of the DPS is being managed under plans, either federal management or HCPs, with which plaintiffs have no quarrel. FWS was well aware of the problems with some of the state management practices. It weighed those problems against the size of the area in the DPS facing them, as well as against newer regulatory systems designed to improve conservation. Thus, FWS considered the relevant factors and articulated a rational connection between the facts found and the choice made. FWS appropriately analyzed this ESA factor.

D.  Consideration of a Significant Portion of the Coastal Cutthroat Trout's Range

Plaintiffs' final argument is based on the definitions for endangered and threatened species. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." Id. at § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20).

Plaintiffs contend that FWS failed to consider whether the anadromous component inhabits a "significant portion of [the] range," as required by the ESA. Plaintiffs argue that FWS must consider the unique threats in the portion of the range under examination and not by looking at the entire landscape inhabited by the DPS. Geographically, plaintiffs note that only the anadromous life history occupies the estuaries, near-shore areas, and migratory paths to the sea, which are the areas where the habitat has become most degraded. In particular, plaintiffs contend that although FWS acknowledged indications of declines for the adult anadromous

population in the lower Columbia River and its tributaries, it did not specifically weigh whether the area constitutes a significant portion of the DPS's range.

FWS argues that all three life strategies must be analyzed together whether FWS is considering possible threatened or endangered status in all of its range or only in a significant portion of its range. Thus, FWS contends that it is not required to consider whether the anadromous component inhabits a significant portion of the range, something plaintiffs contend FWS failed to do. FWS cites case law concerning the flexible standard and wide degree of discretion given the agency when considering this issue. It notes that anadromous coastal cutthroat trout spend a lot of their lives in the same habitat occupied by the other two life-history strategies, thus making it nearly impossible to determine life history exclusively by habitat. FWS also points to the record showing that coastal cutthroat trout, in some form, occupy the entire SWW/CR DPS.

In examining FWS's listing determination on the flat-tailed horned lizard, the Ninth Circuit analyzed the phrase "in danger of extinction throughout . . . a significant portion of its range" and concluded that it was inherently ambiguous. Defenders of Wildlife v. Norton, 258 F.3d 1136, 1141 (9th Cir. 2001). The court held, "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." Id. at 1145 (internal citation omitted). The Secretary has a wide degree of discretion in delineating a "significant portion of its range" because the term is not defined in the statute. Id. In Defenders, the Secretary failed to explain: (1) her conclusion that the area of private lands in which the species can no longer live is not a significant portion of its range; (2) whether private lands required enhanced protection not needed on public lands; and (3) whether the lizard faced unique threats in major subportions of the two states in which it lived. Because

of this, the court concluded that the Secretary's decision to withdraw the proposed rule recommending the lizard for ESA protection was arbitrary and capricious. Id. at 1145-46.

Plaintiffs' argument here is based on their belief that the degraded habitat affected the anadromous population to a greater extent than FWS concluded after studying the new data. In Defenders, the Secretary emphasized the conservation efforts on public land and did not adequately address private land. Id. at 1141. Here, FWS did address the anadromous habitat, as explained above. Compton's internal comments explaining the change of course for the FWS team are restricted to the lower Columbia River. AR 7210. The withdrawal notice has a detailed discussion of the present or threatened destruction, modification, or curtailment of the coastal cutthroat trout's habitat or range. AR 14-18. FWS concluded that the two near-extinctions cited in the proposed rule were not supported by a further study of the data. AR 17. Put simply, the coastal cutthroat trout was adapting better than expected to the habitat problems it faced.

> There has been a change in the accessibility of some areas to anadromous cutthroat trout due to barriers created by dams, diversions, culverts, dikes, tidegates, and water quality. Some streams within the DPS's range have been lost to development, such as streams in the more developed portions of Portland, Oregon. The total amount of currently inaccessible habitat is unknown, but it includes only a very small percentage of the total available habitat within the DPS's range and is interspersed with occupied habitat. Despite the long-term, widespread impacts to aquatic and riparian conditions, coastal cutthroat trout have survived in these areas for many generations and remain well distributed at densities comparable to healthy-sized populations in large portions of the DPS's range. There is no reason to believe that they will not continue to do so. Based on the above information, there is no significant present or identifiable threat of curtailment of the range of the DPS.

AR 17-18. See also AR 14-15 (same conclusion on the effect of forestry management practices).

I conclude that FWS took the required hard look at whether the coastal cutthroat trout is in danger of extinction in a significant portion of its range.

**CONCLUSION**

In summary, FWS's decision to withdraw the proposed rule complied with the ESA and was not arbitrary and capricious. Defendant's Motion to Strike (#58) is granted in part. Plaintiffs' Motion for Summary Judgment (#19) is denied. Defendant's Motion for Summary Judgment (#39) is granted. Defendant-Intervenors' Motion for Summary Judgment (#43) is granted. This action is dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____16th_____ day of November, 2005.

_____/s/ Garr M. King_____
Garr M. King
United States District Judge